**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| CARSON HUMPHREY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-24-1307-D |
| | ) | |
| GLOBAL PAYMENT HOLDING COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Before the Court are the parties' cross-motions for summary judgment filed pursuant to FED. R. CIV. P. 56: Plaintiff Carson Humphrey's Motion for Partial Summary Judgment [Doc. No. 23]; and Defendant Global Payment Holding Company's (GPHC) Motion for Summary Judgment [Doc. No. 26]. In his complaint, Plaintiff alleges GPHC violated the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101, *et seq.*, Oklahoma's Anti-Discrimination Act (the "OADA"), OKLA. STAT. TIT. 25, § 1101, *et seq.*, and the Family and Medical Leave Act (the "FMLA"), 29 U.S.C. §§ 2601 *et seq*.

The Motions are fully briefed and ready for disposition.[1]

**Authentication and Hearsay**

As a preliminary matter, GPHC objects to the Court's consideration of Exhibits 12 and 13 in Plaintiff's Motion [Doc. No. 33, at 6]. GPHC argues Plaintiff's exhibits are not authenticated or self-authenticating and are inadmissible hearsay.

---

[1] GPHC filed a response [Doc. No. 33] in opposition to Plaintiff's Motion and a reply brief [Doc. No. 34] in support of its Motion. Plaintiff filed a response [Doc. No. 32] in opposition to GPHC's Motion and a reply brief [Doc. No. 35] in support of his Motion.

Federal Rule of Civil Procedure 56(c)(2) permits a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." When objecting to admissibility in a motion for summary judgment, "[t]here is no need to make a separate motion to strike." FED. R. CIV. P. 56(c)(2) (advisory committee's notes to the 2010 amendments). The proponent of the challenged evidence bears the burden "to show that the material is admissible as presented or to explain the admissible form that is anticipated [at trial]." *Id*. The Court must examine each challenged document on an individual basis to determine authenticity. *See Law Co., Inc. v. Mohawk Const. & Supply Co., Inc.,* 577 F.3d 1164, 1170 (10th Cir. 2009).

A district court may consider an unauthenticated exhibit in a motion for summary judgment if the plaintiff "could likely authenticate the [document] in short order" at trial. *Weinbaum v. Las Cruces Pub. Schs.,* 465 F. Supp. 2d 1116, 1132 n.16 (D.N.M. 2006) (citing *Barnes v. United States*, 137 Fed. Appx. 184, 189 (10th Cir. 2005)). A submitted exhibit may be sufficiently authenticated by taking into consideration the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances of its production." *Mohawk,* 577 F.3d at 1171.

Regarding Plaintiff's Exhibits 12 and 13, the Court finds that each objected-to document's appearance, contents, or substance, taken in conjunction with the circumstances of its production, for summary judgment purposes.

Plaintiff's Exhibit 12 consists of medical progress notes prepared by Dr. Thomas Wade Toalson for a follow-up appointment with Plaintiff after his diagnoses of major depressive disorder and anxiety. Plaintiff's Exhibit 13 consists of therapy progress notes

prepared by Licensed Professional Counselor (LPC) Kristen Anderson for an appointment with Plaintiff. GPHC maintains that the exhibits are inadmissible hearsay because Plaintiff has not designated any physicians or records custodian as witnesses for trial, provided an affidavit, or offered any other means to authenticate the exhibits.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). Plaintiff has not named the providers who prepared the treatment as witnesses, and it appears that the parties did not depose either provider. Plaintiff maintains that he can authenticate Exhibit 13 because he himself signed off on the notes for his April 5, 2023 appointment. [Doc. No. 35, at 2].

Despite GPHC's arguments to the contrary, an affidavit is not required "to authenticate every document submitted for consideration at summary judgment." *Mohawk,* 577 F.3d at 1170. Defendant has given the Court no reason to question the authenticity of Plaintiff's medical records (Exhibits 12 and 13), and Plaintiff would be able to testify to the authenticity of his medical records at trial. *See McCrae v. H.N.S. Mgmt. Co*., No. 3:22-CV-00217-MEG, 2024 WL 1973431, at *3 (D. Conn. May 3, 2024) (rejecting authentication objection to the plaintiffs' medical records in an ADA failure-to-accommodate suit and noting that "while it may be true that the exhibits are not properly authenticated at the summary judgment stage, Plaintiffs will be able to testify to the authenticity of the medical records and the photographs.").

GPHC's argument that Plaintiff's exhibits are hearsay also fails. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. FED. R. EVID. 801(c).

Plaintiff argues that the exhibits qualify as medical records under FED. R. EVID. 803(4) or as a record of his-then existing, mental, emotional, or physical condition under FED. R. EVID. 803(3).

The Court finds Plaintiff's Exhibits 12 and 13 are in a form that would be admissible. FED. R. EVID. 803(4).

Under Rule 803(4), a statement that "(A) is made for--and is reasonably pertinent to--medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause" is admissible as an exception to the rule against hearsay. *See Berquist v. Lynch,* No. 2:14-CV-0295-SMJ, 2015 WL 4876344, at *4 (E.D. Wash. Aug. 14, 2015) (rejecting defendant's hearsay objection to plaintiff's medical records in an ADA failure-to-accommodate suit because medical records were "comprised of statements reasonably pertinent to medical diagnoses"); *United States v. Gonzalez*, 905 F.3d 165, 199-200 (3d Cir. 2018) (applying Rule 803(4) "to statements made to therapists and mental health professionals."). GPHC's objection to Plaintiff's usage of Exhibits 12 and 13 is overruled.

**BACKGROUND**

This lawsuit arises from Plaintiff's employment with, and subsequent termination from, Defendant GPHC. Plaintiff filed this lawsuit on November 15, 2024, in Oklahoma state court and GPHC removed the case to federal court. GPHC now seeks summary judgment on Plaintiff's claims, and Plaintiff seeks partial summary judgment on GPHC's failure to mitigate defense and the issue of whether he is a person with a disability as defined by the ADA.

## UNDISPUTED MATERIAL FACTS[2]

Defendant GPHC provides payment processing and software products which enable businesses and financial institutions to process electronic payments. GPHC hired Plaintiff to work as a corporate recruiter in May 2022. In that role, he was responsible for screening candidate application materials, conducting preliminary interviews, interacting with hiring managers to develop an understanding of job requirements, opening job requisitions, scheduling candidate interviews and travel, creating written job offers, and communicating with selected candidates about offers, salary, and benefit terms.

Plaintiff reported directly to Addison Martel, Director of Corporate Recruiting/Talent Acquisition, who in turn reported to Cara Greenhaw, Senior Vice President of Human Resources. In late 2022 and early 2023, Plaintiff led the recruitment search for a Senior Vice-President level position for GPHC. Following the successful placement of a candidate for the role, Plaintiff received a $5,000 bonus from GPHC for his services.

In March 2023, Plaintiff began working on the recruitment of a candidate for another high-level position within GPHC. At the end of the month, Plaintiff informed Martel, his supervisor, that he was experiencing personal difficulties, had "been in a severe state of anxiety, [and] depression for the last three years," and "need[ed] some time to work through

[2] This statement includes material facts that are supported by the record and not opposed in the manner required by FED. R. CIV. P. 56(c)(1) and LCvR56.1(d). All facts properly presented by a party and not specifically controverted by an opponent are deemed admitted, pursuant to FED. R. CIV. P. 56(e)(2) and LCvR56.1(e). Further, any fact stated by a party that is not supported by the party's citation to the record is disregarded.

some things for [himself].” [Doc. No. 24-1 at 3]. Martel connected Plaintiff to Human Resources to initiate the process of requesting leave.

Plaintiff began leave on March 30, 2023. Plaintiff was informed that, at the time of his request for leave, he was ineligible for FMLA leave because he had been employed by GPHC for less than a year but was eligible for ADA accommodations leave. [Doc. No. 24-6, at 2]. Kawana Ramsey, a GPHC human resources generalist, advised Plaintiff on the process for requesting a leave of absence and submitting a short-term disability claim if he planned to be “out of work for more than 3 business days.” *Id.* Ramsey informed Plaintiff that if his short-term disability claim was approved by GPHC’s third-party FMLA and short-term disability claims administrator, the Lincoln Financial Group (LFG), his ADA leave would run concurrently with his short-term disability claim until its expiration. *Id.* Plaintiff submitted a short-term disability claim with LFG. [Doc. No. 26-13]. Plaintiff also submitted an FMLA claim, which was denied on April 6, 2023. [Doc. No. 26-14].

On May 15, 2023, LFG notified Plaintiff that his short-term disability request would be denied for a lack of medical documentation to support Plaintiff’s diagnoses. [Doc. No 26-15]. That same day, Plaintiff asked GPHC’s human resources department for information on how he could begin the process to return to work. [Doc. No. 24-5]. He told GPHC his short-term disability claim would be initially denied on May 22, 2023, but that he escalated his claim with LFG and was waiting for an LFG manager to call him back. *Id.* Greenhaw told Plaintiff he was not approved to return to work during the pendency of his short-term disability claim. *Id.*

At some point, Plaintiff submitted a second FMLA request, which LFG received on May 19, 2023. [Doc. No. 26-14, at 3]. LFG informed Plaintiff that he needed to submit a Certification of Health Care Provider form, as a decision on his FMLA claim could be reached independently of the merits of his short-term disability claim. *Id*.

On May 30, 2023, GPHC asked Plaintiff to submit a release to return to work form and a team member health questionnaire form, filled out by his physician, "for consideration of an accommodation." [Doc. No. 24-2, at 2]. The team member health questionnaire form states: "I am requesting an accommodation under the Americans with Disabilities Act ('ADA'), in order to perform the essential functions of my position." [Doc. No. 24-3, at 1].

On May 31, 2023, Plaintiff submitted a release to return to work form prepared by his primary care physician, Dr. Toalson. [Doc. No. 24-2, at 2]; [Doc. No. 26-21, at 1]. On June 1, 2023, Plaintiff submitted a release to return to work form prepared by LPC Anderson, but he also informed GPHC that Anderson advised him she could not fill out the team member health questionnaire form as she was not a medical professional. [Doc. No. 24-2, at 1-2]; [Doc. No. 26-21, at 3]. Dr. Toalson and LPC Anderson released Plaintiff to return to work on June 5, 2023. On June 2, 2023, GPHC notified Plaintiff that his return to work would proceed once the questionnaire form was returned. [Doc. No. 24-2, at 1].

On June 2, 2023, Plaintiff's short-term disability claim was denied by LFG. [Doc. No. 26-22]. LFG determined that Plaintiff's medical records "lack[ed] evidence that [his] symptoms [were] of a severity to cause global functional impairment and sustained

restrictions and limitations beyond [March 31, 2023] [were] not warranted." *Id.* at 3. Plaintiff appealed the finding, but LFG upheld the denial. *Id.* at 14-16.

That same day, LFG notified Plaintiff that he must submit the completed Certification of Health Care Provider form within 15 days or his FMLA claim could be denied. [Doc. No. 26-14, at 8].

On June 14, 2023, Plaintiff returned the health questionnaire form, filled out by his primary care physician, to GPHC. [Doc. No. 24-2, at 1]. In the June 14, 2023 team member health questionnaire, Plaintiff's physician stated that Plaintiff was "treated for anxiety and depression, but is no longer impaired and can return to work." [Doc. No. 24-3, at 4]. When asked, "[i]f there [was] any additional information that may be helpful to [GHPC]'s evaluation of how it might accommodate [Plaintiff]'s physical or mental impairment so that [he is] regularly able to perform all the essential job functions of [his] position," Plaintiff's physician answered:

> No. The patient was off work due to severe anxiety and depression. He has undergone treatment and is able to return to work without any limitations.

*Id.* at 7.

GPHC told Plaintiff he was "approved to return to [the] office effective [June 15, 2023]." [Doc. No. 33-6, at 1]. On June 20, 2023, Plaintiff's second FMLA claim was denied for a failure to submit the required documentation. [Doc. No. 26-14, at 14].

Shortly after his return to work, issues with Plaintiff's job performance started to arise. [Doc. No. 26-24]. Plaintiff admitted to making mistakes with building "marketing reqs" and that he "quite frankly made too many mistakes" which was not acceptable. *Id.* at

5. Martel observed a negative change in attitude from Plaintiff, and that Plaintiff was late or missed appointments with candidates. Plaintiff asked Martel about compensation for the placement of a candidate he assisted with recruiting before taking leave along with general questions about his career progression within the company, and requested a performance review.

In a follow up email with Plaintiff after meeting with him to discuss his performance, Martel told Plaintiff that there was "no promotion, raise, or bonus opportunity . . . being offered." *Id.* at 8. Martel advised Plaintiff that to grow in his role within the company, he needed to see consistency and accountability. *Id.* Plaintiff eventually received a $2,500 bonus for his role in placing the candidate whose recruitment he assisted with before taking leave. [Doc. No. 32-8, at 2].

On August 24, 2023, GPHC received a negative review on the website Glassdoor, in which a candidate complained of an unfortunate interview experience with a GPHC recruiter, later identified by GPHC as Plaintiff. [Doc. No. 26-25]. The candidate stated that "[t]he recruiter appeared to be uninformed about the role [they were] interviewing for" and that the recruiter's "lack of organization was evident from the start." *Id.* The candidate further noted that the interview was cancelled before, and that Plaintiff showed up late for the rescheduled interview. *Id.* The candidate "attempted to follow up" after the interview, but was left without a response, which "felt disrespectful of [their] time and effort." *Id.*

Martel showed Plaintiff the Glassdoor review, and Plaintiff stated that he did not "always have [his] A game" and would try to reach out to the candidate "'to smooth things over.'" [Doc. No. 26-11, at 10].

In September, Greenhaw and Brené Mayes, GPHC's Human Resources Manager, were notified by GPHC's Senior Vice President of Marketing that another recruiting issue involving Plaintiff had arisen. [Doc. Nos. 26-7, at 13, 15-16 and 26-17, at 8-9]. Greenhaw and Mayes were informed that Plaintiff failed to keep a candidate "warm" in a recruiting search involving two candidates. That meant that Plaintiff was supposed to not let the second-choice candidate "know that [GPHC had] extended an offer to another candidate until the final decision[] [had] been made." [Doc. No. 26-7, at 15]. GPHC's Senior Director of Marketing Operations told Mayes that Plaintiff informed one of the candidates that she was the second choice and that GPHC had already decided to go with someone else for the role. [Doc. No. 26-26].

Greenhaw reached out to Mayes and asked her to prepare termination paperwork for Plaintiff and to attend a meeting with Plaintiff to discuss his performance issues. [Doc. No. 26-7, at 12]. On September 7, 2023, Mayes and Greenhaw met with Plaintiff to discuss his performance. [Doc. No. 26-18, at 7]. Mayes recalled that the meeting was short, and Greenhaw informed Plaintiff that he was terminated. Greenhaw confirmed that she made the decision to terminate Plaintiff.

Plaintiff reached out to the second-choice candidate to inform her that his employment at GPHC was terminated. He told the candidate that his decision to inform her that GPHC had selected another person for the role was one of the reasons why he was terminated. [Doc. No. 26-27, at 6]. He added that he didn't "think [GPHC] [had] it out for [him] or anything" and that he just didn't think that they understood him and that he did not "jive with [his] manager." *Id.* at 7.

Following his termination as a GPHC employee, Plaintiff began advertising himself as a handyman on his Facebook page. [Doc. No. 33-4].

## STANDARD OF DECISION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the facts and evidence are such that a reasonable jury could return a verdict for the nonmoving party. *Id.* All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id.* at 255.

A movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); *see also* FED. R. CIV. P. 56(c)(1)(A). The inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

"Cross-motions for summary judgment are treated as two individual motions for

summary judgment and held to the same standard, with each motion viewed in the light most favorable to its nonmoving party." *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019). When the parties file cross motions for summary judgment, the Court is entitled to assume "'no evidence needs to be considered other than that filed by the parties.'" *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quoting *James Barlow Fam. Ltd. P'ship v. David M. Munson, Inc.,* 132 F.3d 1316, 1319 (10th Cir. 1997)).

**DISCUSSION**

**I. Whether Plaintiff was disabled**

Plaintiff seeks summary judgment in his favor on the issue of whether he was disabled under the ADA. GPHC contends he was not disabled.

Disability under the ADA is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C). Plaintiff contends his diagnoses of major depressive disorder and anxiety are mental impairments that qualify him as being disabled under the ADA.

Depression and anxiety are recognized impairments under the ADA. *Russell v. Phillips 66 Co.,* 687 F. App'x 748, 753 (10th Cir. 2017) (unpublished); E.E.O.C., *EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities*, 1997 WL 34622315, at *2 (Mar. 25, 1997) (identifying anxiety disorders as an example of emotional or mental illness included within the ADA's mental impairments). However,

GPHC maintains that Plaintiff cannot show his depression and anxiety limited a major life activity.

The Tenth Circuit has stated that:

> To establish an ADA disability under subsection (A), [Tenth Circuit] precedent indicates that a plaintiff must "articulate with precision" both her impairment and the major life activity it substantially limited. An impairment is substantially limiting when it renders an individual either unable or significantly restricted in her ability to perform a major life activity "compared to the average person in the general population."

*Johnson v. Weld Cnty., Colo.,* 594 F.3d 1202, 1218 (10th Cir. 2010) (internal citation omitted) (quoting *Doebele v. Sprint/United Mgmt. Co.,* 342 F.3d 1117, 1129-30 (10th Cir. 2003)).

Plaintiff maintains that his medical records (Exhibits 12 and 13) show his depression and anxiety were interfering with major life activities such as daily living self care, relationship functioning, social functioning, and occupational/academic. [Doc. No. 24, at 18]. Major life activities include, but are not limited to:

> Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working[.]

29 C.F.R. § 1630.2(i)(1)(i). And, in "determining other examples of major life activities, the term 'major' shall not be interpreted strictly to create a demanding standard for disability." *Id.* § 1630.2(i)(2).

GPHC does not raise the issue of whether Plaintiff has sufficiently identified major life activities and instead focuses the brunt of its response and its motion on whether Plaintiff can show his depression and anxiety limited any major life activities. "[W]hen a

plaintiff alleges an impairment 'that a lay jury can fathom without expert guidance,' courts generally 'do not require medical evidence' to establish an ADA disability." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 997 (10th Cir. 2019) (quoting *Mancini v. City of Providence by and through Lombardi*, 909 F.3d 32, 42 (1st Cir. 2018)). "[C]ourts assess the necessity of expert evidence on a case-by-case basis and consider the type of disability alleged," and expert testimony is required "only if an impairment is 'rare' or 'of such character as to require skilled and professional persons to determine the cause and extent thereof.'" *Id.* at 998 (citations omitted).

To support his contention that his impairments of depression and anxiety substantially limited his major life activities, Plaintiff relies on his treatment progress notes from Dr. Toalson and LPC Anderson. Although the Court has determined that the progress notes are admissible for the purposes of summary judgment, GPHC still contends expert medical testimony is needed to show that Plaintiff's impairments substantially limited his major life activities and the medical records alone are not enough.

The Court finds expert testimony is required to show Plaintiff's mental conditions of depression and anxiety substantially limited his major life activities. Plaintiff's conditions of major depressive disorder and anxiety are akin to post-traumatic stress disorder and acute anxiety, regarding which the Tenth Circuit has required the usage of expert testimony to show impairment of major life activity. *Neri v. Bd. of Educ. for Albuquerque Pub. Schs.,* 860 F. App'x 556, 561–62 (10th Cir. 2021) (unpublished) (affirming in part district court's granting of employer's summary judgment motion on the basis that the employee could not show her PTSD substantially limited a major life activity

because although she "could testify about the physical and mental symptoms she experienced," she was "not competent to testify that those symptoms were caused by PTSD or to opine on the physical or mental effects of PTSD generally, 'for those are clearly matters beyond the realm of common experience and require the special skill and knowledge of an expert witness.'" (quoting *Felkins v. City of Lakewood*, 774 F.3d 647, 652 (10th Cir. 2014)); *see also Clancy v. Miller*, 837 F. App'x 630, 635–36 (10th Cir. 2020) (unpublished) (affirming district court's finding that employee "without expert testimony, . . . could not prove that her depression, anxiety, and PTSD substantially limited at least one major life activity while she worked . . . .").

Plaintiff relies on 29 C.F.R. § 1630.2(j)(3)(ii)-(iii), which provides that "major depressive disorder" "will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity." However, in *Neri,* the Tenth Circuit rejected a similar argument raised by the plaintiff therein, who relied on the same regulation to support her claim of "actual disability" due to her impairment, PTSD, substantially limiting a major life activity. *Neri,* 860 F. App'x, at 563 ("[W]e are not persuaded that in this case the general provisions of § 1630.2(j)(3) overcome the need for expert medical evidence to connect Mrs. Neri's alleged symptoms to her PTSD."). Therefore, without any expert testimony, Plaintiff cannot make a showing of actual disability.

Likewise, for similar reasons, Plaintiff fails to show a record of having such an impairment under subsection (B) of 42 U.S.C. § 12102(1). "To have a record of such an impairment, a plaintiff must have a history of, or been misclassified as having, an impairment that substantially limited a major life activity." *Sorensen v. Univ. of Utah Hosp.,*

194 F.3d 1084, 1087 (10th Cir. 1999). "[T]he record-of-impairment standard is satisfied only if she actually suffered [an impairment] that substantially limited one or more of her major life activities." *Id.* And given Plaintiff's failure to designate an expert to testify that his impairments substantially limited his major life activities, Plaintiff cannot show he had a record of having such an impairment.

Finally, Plaintiff alleges that he can show he is disabled under the ADA because GPHC regarded him as having an impairment that substantially limited a major life activity. To establish being "regarded as" having a disability under subsection (C) of 42 U.S.C. § 12102(1), Plaintiff must establish that he was "subjected to an action . . . because of . . . [his] perceived physical or mental impairment." 42 U.S.C. § 12102(3)(A). "In other words, others must have perceived the person as having an impairment and the person must have 'been subjected to an action . . . because of' that perceived impairment." *Manna v. Phillips 66 Co.*, 820 F. App'x 695, 703 (10th Cir. 2020) (quoting § 12102(3)(A)). "But a perceived impairment does not meet this definition if it is 'transitory and minor,' that is, if others perceive the person of having 'an impairment with an actual or expected duration of [six] months or less.'" *Id.* (quoting § 12102(3)(B)).

GPHC does not focus on the issue of whether Plaintiff's impairment was transitory and minor. Instead, it argues Plaintiff cannot establish causation, i.e., that he was subject to an "action prohibited under the [ADA]" because of his perceived impairment. § 12102(3)(A). To support his contention that GPHC regarded him as being disabled, Plaintiff points to GPHC's instruction to apply for short-term disability benefits, which if

approved, would qualify him for ADA accommodations leave, and that GPHC refused to allow him to return to work without completing the short-term disability claim process.

The record shows GPHC regarded Plaintiff as having an impairment and refused to allow him to return to work because of that impairment. In May 2023, GPHC employee Greenhaw explicitly forbade Plaintiff from returning to work while his "condition [was] worsening." [Doc. No. 24-5]. Greenhaw confirmed in her deposition that she "didn't want someone to return to work who was not mentally able to work." [Doc. No 24-11, at 7]. Thus, the Court finds Plaintiff was "regarded as" disabled by GPHC.

**II. Plaintiff's failure-to-accommodate claim fails as a matter of law.**

To "discriminate against a qualified individual on the basis of disability" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A).

To establish a prima facie failure-to-accommodate claim, Plaintiff must show: "(1) [he] was disabled; (2) [he] was otherwise qualified; (3) [he] requested a plausibly reasonable accommodation; and (4) Defendant refused to accommodate [his] disability." *Norwood v. United Parcel Serv., Inc.*, 57 F.4th 779, 786 (10th Cir. 2023) (citing *Dansie v. Union Pac. R.R. Co.*, 42 F.4th 1184, 1192 (10th Cir. 2022)). If Plaintiff establishes a prima facie case, the burden shifts to the employer, GPHC, to "present evidence either 'conclusively rebutting one or more elements of plaintiff's prima facie case' or 'establishing an affirmative defense.'" *Id.* If GPHC meets this burden, "a district court grants the

employer summary judgment 'unless the employee presents evidence establishing a genuine dispute about the affirmative defenses or rehabilitates any challenged elements of [his] prima facie case sufficiently to establish at least a genuine dispute of material fact.'" *Id.* (quoting *Dansie*, 42 F.4th at 786).

Given the Court's finding that Plaintiff was disabled, the Court turns to the issue of whether Plaintiff requested a plausibly reasonable accommodation.[3] Plaintiff claims that he requested a plausibly reasonable accommodation for his conditions when he asked his supervisor, Martel, if he could take some time off to work through personal issues. [Doc. No. 24, at 8].

The Court finds it is undisputed that Plaintiff requested a plausibly reasonable accommodation. Now, the issue becomes whether GPHC refused to accommodate Plaintiff's request.

GPHC focuses its motion primarily on the period after Plaintiff returned to work, not the period leading up to his leave of absence [Doc. No. 26, at 20-22], but in its reply brief to Plaintiff's motion, it notes that it "did not address this because [Plaintiff] actually received the very leave he requested." [Doc. No. 34, at 7].

The Court finds that no reasonable jury could find that GPHC refused to accommodate Plaintiff's disability. Although Plaintiff is correct that "[l]eave is one form of accommodation" [Doc. No. 32, at 22], it is undisputed that Plaintiff received an accommodation for his need to take time off work in March as Plaintiff was on leave for

---

[3] It is undisputed that Plaintiff was otherwise qualified for the position he held at GPHC.

ten weeks. The evidentiary record also shows Plaintiff's leave was never rescinded or altered by GPHC. Instead, he requested to return to work, which GPHC initially disallowed before allowing him to return upon receiving the health questionnaire form, in which Plaintiff's doctor stated he was "treated for anxiety and depression, but is no longer impaired and [could] return to work." [Doc. No. 24-3, at 4].

GPHC has presented evidence "conclusively rebutting one . . . element[] of plaintiff's prima facie case," thus, GPHC is entitled to judgment as a matter of law on Plaintiff's failure to accommodate claim under the ADA and OADA. *Aubrey v. Koeppes*, 975 F.3d 995, 1014 (10th Cir. 2020) (citing *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017)).[4]

## III. Plaintiff's ADA discrimination claim fails as a matter of law.

GPHC also seeks summary judgment on Plaintiff's ADA disparate treatment claim.[5] "The Tenth Circuit describes the prima facie case for disparate-treatment discrimination as

---

[4] "'[T]he protections provided by the OADA are co-extensive with the protections provided by federal law under the ADA.'" *Hawkins v. Schwan's Home Serv., Inc.,* No. CIV-12-0084-HE, 2013 WL 2368813, at *10 (W.D. Okla. May 28, 2013) (quoting *Engles v. Hilti, Inc.,* No. 11-CCV-491-JED-PJC, 2013 WL 1387282, at * 6 (N.D. Okla. Apr. 4, 2013), *aff'd*, 778 F.3d 877 (10th Cir. 2015)). Therefore, because Plaintiff's ADA accommodations claim fails, "his claim under the OADA similarly fails." *Id.*

[5] In his complaint, Plaintiff labels his claim under the ADA as "Disability Discrimination." [Doc. No. 1-1, at 6]. "'Discrimination' as used in the ADA encompasses three distinct types of discrimination." *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1188–89 (10th Cir. 2003). "First, it means treating 'a qualified individual with a disability' differently because of the disability, that is, disparate treatment." *Id.* "Additionally, because the ADA defines discrimination in part as 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual . . .,' a separate claim of discrimination can be stated under the ADA for failing to provide a reasonable accommodation." *Id.* (internal citation omitted). "Finally, under a

not onerous." *Paraham v. Atriums Mgmt. Co., Inc.*, No. 16-2539, 2018 WL 691000, at *4 (D. Kan. Feb. 2, 2018) (citing *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015)). "This usually means that the plaintiff must show that he suffered an adverse employment action because of his disability." *Id.* (citing *Dewitt v. Sw. Bell Tel. Co.,* 845 F.3d 1299, 1308 (10th Cir. 2017)). Here, Plaintiff alleges he was terminated because of his disability.

Given that the Court has determined Plaintiff was regarded as a disabled person under the ADA, the burden shifts to GPHC to proffer a legitimate, non-discriminatory reason for its employment decision. *See Mackenzie v. City and Cnty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005).

GPHC asserts that Plaintiff was terminated because of poor performance following his return, multiple incidents that negatively tarnished its business reputation, and a failure to take accountability for those deficiencies in his performance. Notably, Plaintiff acknowledged his "many mistakes" in regard to his performance, and it is also undisputed that the negative Glassdoor review GPHC received was attributed to Plaintiff.

The Court finds GPHC's proffered reason to be legitimate and nondiscriminatory. Thus, the burden shifts back to Plaintiff to show that the reason provided by GPHC for its decision to terminate his employment is pretextual. *See MacKenzie*, 414 F.3d at 1274.

---

(continued . . . .) disparate impact theory, discrimination is defined as including the use of 'qualification standards . . . or other selection criteria that screen out or tend to screen out an individual with a disability . . . .'" *Id.* The parties' briefing only focuses on failure-to-accommodate and disparate treatment discrimination, so the Court proceeds on the assumption that those forms of discrimination are the bases of Plaintiff's ADA claim.

**1. Pretext**

"A plaintiff may show pretext by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citation omitted). In determining pretext, it is not for the Court to decide whether GPHC's reasons for its decision were "wise, fair, or even correct," so long as they were truly the reasons for the decision. *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1083 (10th Cir. 1999) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997)). The Court's role is "to prevent unlawful [employment] practices, not to act as a super personnel department that second guesses employers' business judgments." *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000) (altered for clarity) (quotation and citation omitted). "[A] challenge of pretext requires [courts] to look at the facts as they appear to the person making the decision to terminate [a] plaintiff." *Kendrick,* 220 F.3d at 1231. "Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." *Anderson*, 181 F.3d at 1179 (citing *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1987)).

"Evidence of pretext 'may take a variety of forms.'" *Kendrick*, 220 F.3d at 1230 (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 187–88, (1989)). Typically, a plaintiff may show pretext in one of three ways:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that . . . [the plaintiff] was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.

*Dewitt,* 845 F.3d at 1307.

Plaintiff argues that pretext can be shown because Greenhaw made the decision to terminate him before his performance review meeting; that he took accountability when made aware of deficiencies in his performance; false alibis;[6] lack of documentation for complaints of Plaintiff's negative work performance; and more favorable treatment of other employees.

---

6 In its position statement to the EEOC addressing Plaintiff's Charge of Discrimination claim, GPHC stated that Plaintiff's actions involving the second-choice candidate he failed to keep "warm" put "the marketing department in a challenging position, and ultimately, the department could not secure either candidate." [Doc. No. 32-19, at 4]. GPHC's position statement further stated that Plaintiff never shared "any clinical diagnosis or association with any alleged disability" in his initial request for leave. *Id.* at 2. Plaintiff cites GPHC's admission that it was eventually able to hire the second-choice candidate as evidence of GPHC's false alibi and alleges the same for GPHC's statement that he never disclosed any medical diagnoses to it. Plaintiff maintains that GPHC's false alibi is indicative of pretext.

Plaintiff does not cite any authorities to support his contention that a false alibi demonstrates pretext (the authorities relied upon by Plaintiff address false alibis in the criminal context), and the Court finds that GPHC's statements to the EEOC were not false. It is undisputed that GPHC was able to hire one of the candidates, who ultimately departed before the EEOC position statement was submitted. GPHC points to Plaintiff's conduct in their recruiting efforts as the reason why it could not successfully retain the candidate for longer than three months. And the record does not show that Plaintiff disclosed a medical diagnosis to Martel when he initially requested time off.

**2. Timing of decision to terminate Plaintiff's employment**

Plaintiff argues that GPHC had already made the decision to terminate him before his final meeting with Greenhaw and Mayes and that it was not his conduct during the meeting that led to his termination. Plaintiff points to Greenhaw's preparation of the termination paperwork before the meeting to support this contention.

Greenhaw confirmed it was her decision to terminate Plaintiff and that she asked Mayes to prepare the termination paperwork in advance but maintains that she went into the meeting without a final decision and that the paperwork was prepared in the event that a decision was made to terminate during the meeting. [Doc. No. 26-7, at 12, 17]. She testified that if she decided not to terminate Plaintiff following the meeting, she planned on going back to her supervisor, GPHC's Senior Vice President of Marketing, and explain that Plaintiff "was remorseful" for his conduct and "willing to work on a plan to be able to correct it." *Id.* She maintains that Plaintiff was "terminated for not indicating that he had any desire to do better than" his performance reflected in the Glassdoor review and his failure to keep a second-choice candidate warm. *Id.*

Plaintiff testified that he was terminated at the outset of the meeting and that he did not have the opportunity to respond to the deficiencies in his performance raised by Greenhaw. [Doc. No. 32-8, 7]. Greenhaw testified that she brought up the Glassdoor review and the issue with the candidate Plaintiff allegedly failed to keep warm, and that "[h]e did not indicate that he was interested in improving his performance at all," which led to her decision to terminate his employment. [Doc. No. 26-7, at 13-14, 16-17].

The Tenth Circuit recognizes that "[c]onflicting evidence regarding the point in time at which" the termination decision-maker "made the decision to terminate" an employee can contribute to a showing of pretext. *Plotke v. White*, 405 F.3d 1092, 1103-04 (10th Cir. 2005). However, where the Tenth Circuit has found a former employee made a sufficient showing of fact as to pretext based on timing, the employee has presented evidence that "the defendant's proffered reason for termination was generated only *after* the termination, a factor . . . long held significant in assessing claims of pretext." *Young v. Dillon Companies, Inc.,* 468 F.3d 1243, 1252 (10th Cir. 2006). Here, GPHC has presented evidence that in the three months before Plaintiff's termination, it became aware of multiple performance issues involving Plaintiff such as the negative Glassdoor review. And that Plaintiff was made aware of each incident relating to his performance before his final meeting with Greenhaw.

"A plaintiff that casts substantial doubt on many of the employer's proffered reasons for termination could cause a jury to reasonably conclude that the employer lacks credibility." *Conus v. Watson's of Kansas City, Inc.*, No. 2:11-CV-02149-JAR, 2012 WL 1934467, at *7 (D. Kan. May 29, 2012). Here, Plaintiff has not presented evidence that would allow a reasonable jury to conclude that GPHC's professed reasons for terminating Plaintiff were pretextual. Indeed, in Plaintiff's own words following his termination, he stated that he was terminated because of his poor performance and that he "didn't think [GPHC] [had] it out for [him] or anything." [Doc. No. 26-27, at 6].

**3. Lack of documentation**

Plaintiff also contends that GPHC's failure to document any of his performance issues after they occurred shows that its cited reason for his termination—poor performance—is pretextual. "A reasonable jury might consider the dearth of negative work reviews circumstantial evidence of pretext," *Bolin v. Oklahoma Conf. of the United Methodist Church*, 397 F. Supp. 2d 1293, 1307 (N.D. Okla. 2005), but "[h]ere, however, there is no evidence that such documentation was a matter of habit and practice [by GPHC]." *Johnson v. Outback Steakhouse of Fla., Inc*., 328 F. Supp. 2d 1115, 1121 (D. Kan. 2004). GPHC's corporate representative testified that the company communicated to employees about any performance issues "in a variety of forms, [such as], informal coaching, advising, [and] conversations." [Doc. No. 32-4, at 4]. Additionally, the summary judgment record is robust with other evidence regarding Plaintiff's performance issues such as the Glassdoor review, and Plaintiff's own message to a candidate, admitting that his termination was for his poor performance. *See id.*

**4. Treatment of other employees**

Plaintiff points to multiple negative Glassdoor reviews received by GPHC, in which job candidates complain of unprofessionalism by GPHC recruiters as proof that he was treated differently by GPHC and that GPHC's failure to terminate these employees demonstrates pretext. "[A] plaintiff may also show pretext on a theory of disparate treatment by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Kendrick,* 220 F.3d at 1232. "An employee is similarly situated to the plaintiff if the

employee deals with the same supervisor and is subject to the 'same standards governing performance evaluation and discipline.'" *Id.* (quoting *Aramburu v. Boeing Co,* 112 F.3d 1398, 1404 (10th Cir. 1997). "A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." *Id.*

Plaintiff's reliance on the Glassdoor reviews cannot support a showing of pretext. First, in his deposition, Plaintiff identified two employees that two of the Glassdoor reviews could be attributed to, but it is unclear from the summary judgment record whether GPHC ever attributed the reviews to the employees he has identified. Second, Plaintiff has failed to show that these employees were similarly situated to him, that is, supervised by the same supervisor. Third, it is unknown from the summary judgment record whether these employees were informed of the negative Glassdoor reviews, and whether they had other negative performance issues like Plaintiff.

In short, Plaintiff fails to point to facts upon which a reasonable jury could find GPHC's expressed reason for terminating him was pretextual. Therefore, the Court concludes summary judgment is appropriate on Plaintiff's disability discrimination claims under the ADA and OADA.[7]

---

[7] Given that the Court finds in GPHC's favor on Plaintiff's ADA and OADA claims, the Court also denies Plaintiff's motion for summary judgment on GPHC's mitigation defense.

**IV. Plaintiff's FMLA Interference claim fails as a matter of law.**

Plaintiff contends that GPHC failed to inform him of his FMLA rights and protections when he became eligible for FMLA benefits, prevented him from being able to use his FMLA benefits, and that his termination by GPHC "was motivated, in whole or in part, by [his] past and/or future need for time off work for his . . . or his spouse's serious health conditions." [Doc. No. 1-1, at 7].

The FMLA "makes it unlawful for an employer to interfere with, restrain, or deny the exercise or attempt to exercise any right provided under the FMLA." *Brown v. ScriptPro, LLC,* 700 F.3d 1222, 1226 (10th Cir. 2012) (citing 29 U.S.C. § 2615(a)(1)). To establish an interference claim, an employee must show: "(1) he was entitled to FMLA leave, (2) an adverse action by his employer interfered with his right to take FMLA leave, and (3) this adverse action was related to the exercise or attempted exercise of the employee's FMLA rights." *Id.* (quoting *Metzler v. Fed. Home Loan Bank of Topeka,* 464 F.3d 1164, 1180 (10th Cir. 2006)). "The interference or entitlement theory is derived from the FMLA's creation of substantive rights. If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a deprivation of this right is a violation regardless of the employer's intent." *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002). Thus, "[i]f the employee can demonstrate that the first two elements of interference are satisfied, the employer then bears the burden of demonstrating that the adverse decision was not 'related to the exercise or attempted exercise of [the employee's] FMLA rights.'" *Dalpiaz v. Carbon County*, 760 F.3d 1126,

1132 (10th Cir. 2014) (quoting *Campbell v. Gambro Healthcare, Inc.,* 478 F.3d 1282, 1287 (10th Cir. 2007)). An interference claim fails as a matter of law where the employer "successfully establish[es] that [the employee] would have been dismissed regardless of her request for an FMLA leave." *Id.* at 1133.

It is undisputed that Plaintiff became eligible for FMLA leave on May 16, 2023. [Doc. Nos. 25, at 10 and 32, at 8]. "In order to satisfy the second element of an interference claim, the employee must show that [he] was prevented from taking the full 12 weeks' of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave." *Campbell,* 478 F.3d at 1287. Plaintiff never took FMLA leave, so he does not allege he was denied reinstatement.

Plaintiff submitted a second FMLA leave request after becoming eligible that was ultimately denied. Plaintiff maintains that GPHC failed to provide him notice that he was qualified for FMLA leave because when he initially requested leave, he was told by GPHC's human resources department that he was ineligible for FMLA leave and that the request would be denied. He states that this instruction—that his application would be denied, kept him from applying even after he became eligible.

The Court finds Plaintiff's FMLA claim fails as a matter of law.

First, it is undisputed that Plaintiff submitted a second FMLA leave request and that he received a response from LFG, GPHC's third-party FMLA claims administrator. In that response letter, LFG informed Plaintiff:

> As of [May 23, 2023] and prior to the beginning of your leave date, you have 480 hours of unpaid leave remaining under the [FMLA] for the current 12

> month period, which is measured backwards from the first date leave was taken.

[Doc. No. 26-14, at 3]. Nonetheless, Plaintiff contends that he continued to operate under the assumption that he was ineligible for FMLA leave and was entitled to additional notification and clarification by GPHC regarding his ability to use FMLA leave.

On June 2, 2023, LFG advised Plaintiff that he needed to submit a completed Certification of Health Care Provider form for his FMLA claim and that failure to do so within 15 days may result in the denial of the FMLA claim. Plaintiff never submitted the Certification of Health Care Provider form and LFG denied his FMLA request on June 20, 2023. Accordingly, the undisputed record indicates that Plaintiff failed to submit his form in compliance with GPHC's instructions, and that he was warned of the consequences for failing to do so. Plaintiff has not shown that GPHC interfered with his right to take FMLA leave. *Dulany v. Brennan,* No. 16-CV-149-JHP-FHM, 2017 WL 991070, at *6 (N.D. Okla. Mar. 14, 2017) (granting summary judgment on FMLA interference claim where "Plaintiff did not pursue FMLA and chose not to fill out and submit the completed certifications to the defendant" and failed to identify any "instance where she sought FMLA leave and it was denied, or that [the] defendant otherwise attempted to interfere with the exercise of such rights."), *aff'd*, 736 F. App'x 199 (10th Cir. 2018). GPHC's Motion for Summary Judgment is therefore granted as to Plaintiff's FMLA interference claim.

## CONCLUSION

Plaintiff's Motion for Partial Summary Judgment [Doc. No. 23] is **GRANTED in part** and **DENIED in part**. Specifically, the Court finds Plaintiff established GPHC

regarded him as disabled for the purposes of the ADA. GPHC's Motion for Summary Judgment [Doc. No. 26] is **GRANTED.** A separate judgment shall be entered.

**IT IS SO ORDERED** this 28th day of September, 2026.

TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE